UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VALERIE MARKELLO, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 13 C 4273 |
| CAROLYN COLVIN, Acting Commissioner of Social Security Administration | ) ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Valerie Markello brings this action seeking reversal or remand of the decision by Defendant Carolyn Colvin, Acting Commissioner of the Social Security Administration ("SSA"), denying Plaintiff's claim for Disability Insurance Benefits ("DBI") and Supplemental Security Income ("SSI"). Markello claims that she has been disabled since December 24, 2007 by chronic pain syndrome, fibromyalgia, and narcotic dependence. She challenges the Commissioner's adverse disability determination, arguing that (1) the ALJ failed to properly assess the opinions and notes of Markello's treating physicians, and that (2) the ALJ discounted Plaintiff's credibility without the support of substantial evidence. The parties have filed cross-motions for summary judgment. For the reasons set forth below, the court denies Markello's motion [9], grants the Commissioner's motion [19], and affirms the ALJ's decision.

## BACKGROUND

Markello was 28 years old on December 24, 2007, the date on which, she alleges, her disability began. (R. 65, 208.) She graduated from high school in 1997 and worked for the next ten years as a receptionist and clerk until 2007, most recently at USA Baby, a retail store in Lombard, Illinois. (R. 29, 60, 214, 322.) Markello's tenure at USA Baby ended when she was laid off on December 24, 2007. There was no specific injury or incident that occurred at that time, but she contends that her condition had deteriorated enough by that date that she could

no longer continue working. (R. 237.) In the intervening years, she made one brief return to work in 2010 as a receptionist at a personnel management company. That period of employment lasted only two months before her condition allegedly forced her to quit. (R. 208, 322.)

**A.     Medical History**

Before and after the alleged onset of her disability, Markello received treatment on numerous occasions for pain in her limbs and joints. Her disability claim is primarily based on symptoms of fibromyalgia and anxiety, but the record indicates that she also suffers from obesity, mood disorder, mild cardiomegaly[1], and narcotics dependence. Until December 2008, her primary care providers were Dr. Meyer (first name and specialty unidentified) and Dr. Waheeda Rossian, an internist with the DuPage Medical Group ("DMG"). The DMG doctors diagnosed Markello with chronic pain syndrome as early as October 17, 2007. (R. 367, 376, 378, 380.) A week later, an ultrasound also revealed evidence of polycystic ovary disease[2], but subsequent tests related to her limb pain came back normal. (R. 404, 415.) Roughly one year later, on December 8, 2008, Wassi diagnosed Markello as suffering from generalized anxiety disorder, as well. (R. 355, 357, 359.)

At various times, and as recently as December 2008, Markello received prescriptions for pain medication (including two narcotics: Norco (acetaminophen and hydrocodone) and OxyContin (oxycodone) (R. 362, 366)) from her doctors at DMG. (R. 357.) But Rossi refused to prescribe additional pain medication after December 8, 2008, due to what Rossi referred to as Markello's "problems with misuse and abuse." (*Id.*) These problems ultimately led to Markello's

---

[1]     Cardiomegaly is an "abnormal enlargement of the heart." Dorland's Illustrated Medical Dictionary 299 (31st ed. 2007). The record does not indicate when Markello was originally diagnosed with this condition.

[2]     Other doctors that treated Markello (and non-treating doctors who provided examinations as part of this case) also diagnosed her as suffering from this ovarian disease, but Markello's disability claims do not refer to the malady. (*See* R. 603-05, 641-45, 654-661.)

admission to an inpatient rehab program for narcotics addiction that same month. (R. 607.) As of January 2009, the DMG doctors had "discontinued caring for [Markello]" because of "her pattern of abuse." (*Id.*)

Shortly before entering rehab in December 2008, Markello began to receive treatment from a new doctor: Dr. Nicholas Kondelis, a pain specialist. (R. 607.) Markello told Kondelis that she had been diagnosed with fibromyalgia and chronic pain disorder (R. 603-605); there is no evidence that Kandelis himself made such diagnoses. Kondelis performed a physical examination and found a normal range of motion in Markello's fingers, wrists, and shoulders, and a normal heel-to-toe walk. (R. 604.) Kandelis prescribed Plaintiff a cocktail of drugs, including OxyContin. (R. 603-605.) Following her discharge from rehab, however, on January 22, 2009, Kandelis discontinued prescribing Markello narcotic medications until Kandelis could speak with Meyer, Rossi, and Markello's rehab physicians. (R. 607.) When Kandelis next saw Plaintiff on February 5, 2009, he suggested methadone treatment. (R. 609.) The letter added Norco and methadone to Plaintiff's drug regimen on February 17, 2009, "with the expectation that the Norco prescription will start to decrease." (R. 611-12.) All told, Markello met with Kandelis eleven times between January 22, 2009 and July 20, 2009. (R. 607, 609, 611-12, 614, 619-628.) On each occasion, she complained of acute, severe pain in her limbs, and in her knees in particular. Kandelis continued to prescribe methadone and Norco through at least March 18, 2010. (R. 614, 619-628.)

Kandelis wrote a letter to the "Court of DuPage" on October 5, 2009 regarding "a 48 hour stay in jail,"[3] describing Markello's "history of present illness." (R. 1063.) The record does not identify the purpose of this letter, but its contents suggest that Kandelis was advising the court that Markello's medical condition should be a mitigating factor at sentencing. He informs the court that Markello "has been under [Kandelis's] care for a number of years" and that she

---

[3] The record does not explain why Plaintiff spent two days in jail.

3

"carries a well documented diagnosis of fibromyalgia." (*Id.*) Kandelis goes on to suggest, without elaboration, that Plaintiff "would not be suited to service work that would involve lifting and active physical activity. She may be able to perform more sedentary work for short durations." (*Id.*)

Markello also met with Kandelis on October 5, 2009, the date of his letter, again presenting with symptoms of pain and fibromyalgia, as well as depression. (R. 630.) During her next appointment, a month later, Markello told Kandelis about a recent emergency room visit due to severe pain, which reportedly resulted in four injections of narcotics to relieve pain spasms. (R. 631.) This was just one of a number of emergency room visits made by Markello between November 2008 and October 2010. In total, she went to the ER twenty times in that twenty-four month span, reporting symptoms of anxiety, extreme pain related to her fibromyalgia, and, on two occasions, complications related to a pregnancy. (R. 435, 447, 453, 459, 468, 487, 497-505, 511, 528-29, 546, 563, 578, 590, 748, 750, 826, 845-49, 857, 869, 885, 897, 900.) One of her ER physicians, Dr. Mary Burns, declined to prescribe narcotics to Markello after Markello admitted that she had been prescribed 120 Norco tablets just 10 days earlier. (R. 511.) In a report related to Markello's ER visit on April 24, 2010, Burns described Markello as a "known narcotic abuser and misuser." (R. 511.) On other occasions, Plaintiff claimed that her drugs had been stolen or lost. (R. 607, 617, 845-59, 900.)

Markello continued to see Kandelis at approximately one-month intervals from December 1, 2009 to April 15, 2010, each time reporting continued pain (R. 617, 632, 634, 635, 636, 638), despite a drug regimen that, as of February 2010, consisted of methadone, Norco, tramadol, amitriptyline, and Valium.[4] (R. 636.) During the April 15, 2010 visit, Kandelis

---

[4] Methadone is a narcotic used to treat moderate to severe pain, but it can also treat narcotic drug addiction. Dorland's Illustrated Medical Dictionary 1163-64 (31st ed. 2007). Norco is a combination of acetaminophen and hydrocodone used to treat pain. *Id.* at 1309. Tramadol is a narcotic used to treat pain. *Id.* at 1977. Amitriptyline is an antidepressant and nerve pain medication. *Id.* at 64. Valium, which is a brand name of the drug diazepam, is a sedative used to treat anxiety and muscle spasms. *Id.* at 519.

identified "internal derangement" in Markello's right knee, and noted that she was on a waiting list to see an orthopedic surgeon. (R. 638.) The doctor and patient met again later that month, on April 26, and Markello reported increased pain. Kandelis added Percocet[5] to the medication regimen. (R. 639.) Markello continued to see Kandelis for her pain until at least August 31, 2010, the date of their latest meeting referred to in the record. (R. 911.)

Upon her discharge from rehab in January 2009, Plaintiff was referred to Dr. Aqeel Khan, a psychiatrist specializing in addiction. (R. 606.) When she first met with Dr. Khan, Markello presented with complaints of depression, and Khan noted that her mood was "constricted" and that her energy and concentration levels were low. (R. 419.) Khan diagnosed Markello with a major depressive disorder and post-traumatic stress disorder ("PTSD").[6] (R. 420.) Plaintiff met with Khan or a therapist at his office forty times between January 2009 and January 2011 to deal with her depression and opiate dependence. (R. 421-31, 939-42, 1045.) Later in 2011, she began to receive treatment from another psychiatrist, Dr. Francisco Cruz, at Russo Family Health Center in Bloomingdale, Illinois. (R. 1019-41.) She was referred to Cruz by her new primary care physician, Dr. Abdel Fahmy.[7] (R. 1036-37.) Cruz diagnosed Markello with bipolar disorder, anxiety disorder, and opiate dependence. (R. 1052-55.) As part of Markello's application for benefits, Cruz noted on January 10, 2012 that Markello had "marked difficulties in maintaining concentration, persistence or pace" due to anxiety. (R. 1054.) Although he did not "anticipate that the ongoing symptoms and effects of medications would cause [Markello] to be 'off-task' more than 15% of a work day," he did not believe that Markello could "function in a competitive work setting . . . on an eight-hour per day five days per week basis." (R. 1053.)

---

[5] Percocet, which is a combination of acetaminophen and oxycodone, is a narcotic used to treat pain. Dorland's Illustrated Medical Dictionary 1249.

[6] The record does not indicate what past trauma triggered Markello's PTSD.

[7] The record does not indicate when Fahmy began to treat Markello.

5

In evaluating Markello's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") on February 11, 2010, several state agency examiners also assessed Plaintiff's health. Dr. Roopa Karri, a non-treating internist physician, reviewed all of Markello's medical records and spent forty-two minutes with her. (R. 641.) Karri diagnosed Markello as obese and suffering from depression and anxiety. Dr. Karri concluded that, despite a limp, Plaintiff could walk fifty feet without support, and that she exhibited a normal range of motion in her hips, knees, and ankles. (R. 643.) Karri found tenderness in nine of eighteen points used to test for fibromyalgia, two short of the eleven tender points necessary for diagnosis of fibromyalgia.[8] (R. 643-44.) Dr. Sandra Bilinsky, a non-examining pediatric physician, also reviewed the record evidence in Plaintiff's case on July 23, 2010, and completed a Physical Residual Functional Capacity ("RFC") Assessment. She noted that Markello could sit about six hours of an eight-hour workday, could lift and/or carry 20 pounds occasionally or 10 pounds frequently, and had an unlimited ability to push and pull despite her fibromyalgia pain. (R. 655.)

State mental health professionals also reviewed Plaintiff's records. A psychologist, Dr. Barbara Sherman, evaluated Markello's medical history and met with her for forty-five minutes on July 6, 2010. (R. 648-653.) Sherman assessed Markello as "suffering from pervasive vegetative signs of clinical depression, including lethargy, impaired concentration, anhedonia[9], loss of appetite, and sleep impairment." (R. 650.) She also determined that Markello was "fully oriented to person, place, and time," and had "no signs of psychosis," but that Markello's judgment "becomes impaired when she is very anxious." (R. 653.) Dr. Lionel Hudspeth, a non-examining physician, reviewed the medical record on January 31, 2011. From that review, he

---

[8] "To be diagnosed with fibromyalgia, you must have had at least 3 months of widespread pain, and pain and tenderness in at least 11 of 18 areas . . . ." (ALJ's Op., R. 21 (quoting PubMed Health, *Fibromyalgia*, http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0001463 (last visited May 2, 2016)).)

[9] Anhedonia is total loss of feeling of pleasure in acts that normally give pleasure. Dorland's Illustrated Medical Dictionary 90.

concluded that Markello had "intact cognition, memory and thought processing skills sufficient for at least two to three step tasks, within physical limitations." (R. 950.) Further, he determined that Markello had only mild restrictions in daily living and moderate difficulty maintaining social functioning as well as concentration, persistence, or pace. (R. 962.) A third state psychologist, Dr. M.W. DiFonso, made similar findings as Hudspeth, and concluded that Markello's "cognitive and attentional skills are . . . adequate for simple one-two step work tasks." (R. 676-78.)

**B.    Procedural History**

On February 11, 2010, Plaintiff filed an application with the SSA for Title II DIB and Title XVI SSI, alleging an inability to work since December 24, 2007, because of chronic pain syndrome, fibromyalgia, and narcotic dependence. (R. 150.) The SSA denied Plaintiff's claim initially on August 4, 2010, on the grounds that her "condition does not keep [her] from working." (R. 78.) Markello filed a request for reconsideration on September 2, 2010 (R. 80), but the SSA denied that request on February 9, 2011. (R. 85.)

*1.    Administrative Hearing*

Markello next requested a hearing with an ALJ on March 10, 2011. (R. 92.) That hearing was held on January 18, 2012. (R. 121.) Markello testified that her inability to find work was due, largely, to her anxiety and fibromyalgia pain. She described a brief period of employment in 2010 after her claimed onset of disability, but said that, because of her frequent hospitalizations, she never completed a full week of work, forcing her to leave the position. (R. 43-44.) Markello stated that dealing with the general public or any kind of stress or pressure triggers her anxiety and fibromyalgia. (R. 58-59.) As a result, she is irritable and "snaps" easily. (R. 59.)

Markello described her fibromyalgia pain as being concentrated in her right leg and back, but added that it sometimes spreads to her right arm and left limbs. (R. 45.) The record does not indicate when Markello first began suffering from these symptoms. As of the time of the hearing, however, she assessed her pain level as a six out of ten. (R. 46.) Markello

7

claimed she was capable of standing for no more than twenty to twenty-five minutes or walking for fifteen to twenty minutes before needing to rest. (R. 50-51.) Although she does not use any devices to assist her when she walks and can bend and kneel, she testified that she cannot perform those activities "for a long time" without pain, (R. 52) and that she can sit for about thirty minutes before needing to "change position." (R. 50.) Plaintiff stated that her "heart failure" resulted in reduced endurance. (R. 51.) For instance, she estimated that she could lift only five pounds without experiencing pain, and that climbing stairs caused her some difficulty. (*Id.*) Although Markello mentioned her history of congestive heart failure as a reason for reduced endurance, she admitted that she is not currently being treated for any cardiac condition, and that her only cardiac problems occurred during a time when she was also suffering from a kidney infection in 2007. (R. 51-52; 642.)

Markello testified that she doesn't sleep well and rests for six or eight hours throughout the day. (R. 53, 58.) Although she doesn't always feel like getting up and dressed because of her depression, Markello acknowledged that she has no trouble with her own personal care. (R. 53-54.) She observed that her mental state is somewhat cyclical: "I'll have a couple good weeks, and then I'll have . . . a couple bad weeks." (R. 54.)

Markello also testified about her day-to-day activities. She drives about once per week, but tries to avoid driving more often "because of the medication [she is] on."[10] (*Id.*) She prepares simple meals and goes shopping and to the grocery store, though always with someone else. (R. 54-55.) Markello is capable of washing a few dishes, but lacks the endurance to wash a sink full of them. (R. 55.) She also makes her own bed but does not vacuum, mop, sweep, or take out the garbage because of her back and arm pain. (*Id.*) Markello spends time reading novels and watching television. (*Id.*) She also checks Facebook

---

[10] Markello did not explain which of her medications make her hesitant to drive.

daily and uses e-mail occasionally. (R. 55-56.) She has a cat, but testified that her boyfriend cares for the pet. (R. 56.)

A vocational expert, James Breen, also testified at the hearing. The ALJ asked Breen to assume

> an individual similar to the claimant's age, education, and work experience who can lift and carry 20 pounds occasionally, 10 pounds frequently, stand and/or walk a total of six hours during an eight-hour day, sit at least six hours during an eight-hour workday. Such an individual should avoid concentrated exposure to work hazards such as height and dangerous moving machinery. Such an individual should not come in contact with the public for work-related purposes, but can come in occasional contact with co-workers and supervisors. Such an individual is limited to two to three-step simple, repeated, routine tasks. Any jobs such an individual can perform?

(R. 61.) Breen testified that with those restrictions, Plaintiff remained capable of performing "unskilled, light occupations," such as light hand packaging, electrical accessories assembly, or mail clerk. (*Id.*) Breen ruled out the types of jobs that Markello had held in the past, however, because her previous responsibilities were "above simple and routine." (*Id.*)

Next, the ALJ asked Breen to consider a slightly different individual with the following characteristics:

> similar to the claimant's age, education, and work experience who can lift and carry 10 pounds occasionally, less than 10 pounds frequently, stand and/or walk a total of two hours during an eight-hour day, sit at least six hours during an eight-hour workday, never climb ladders, rope or scaffolding, occasionally climb ramps and stairs, occasionally balance, stoop, crouch, kneel, and crawl. Such an individual should avoid concentrated exposure to work hazards such as heights and dangerous moving machinery. . . . [N]o contact with the public for work-related purposes, but occasional contact with co-workers and supervisors, restricted to two to three-step simple, repeated, routine tasks. Any jobs such an individual can perform?

(R. 61-62.) Breen again concluded that such an individual could perform certain jobs. "These will be unskilled, sedentary . . . ." Examples included "[a] sorter," "[e]yeglass assembly," and "[p]rinted circuit board assembly." (R. 62.) None of these jobs would be precluded, according to Breen, by the individual's need to stand one or two minutes after every forty-five minutes of sitting or by restrictions on the individual's ability to reach. (*Id.*) If, however, the individual would

9

be "off task at least twenty percent of the workday due to fatigue," Breen testified, he "would consider . . . that person unemployable." (*Id.*)

On April 18, 2012, the ALJ issued a written decision denying Plaintiff's request for benefits. She determined that Plaintiff was not disabled under the Social Security Act because "the objective evidence [does] not support the extent of the claimant's alleged inability to perform work." (R. 25.) In particular, the ALJ noted that Markello's testimony "at times appeared exaggerated" and that "claimant had a history of attempted manipulation of medical staff with the claimant changing her story as needed." (R. 26.) The ALJ also pointed out that "none of the claimant's treating physician[s] opined the claimant was disabled by any of her impairments." (R. 27.) Based on Breen's testimony, the ALJ concluded that, although Markello could not return to her previous vocations, she was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 30.)

Markello exercised her right to appeal the ALJ's decision to the SSA's Appeals Council on May 8, 2012. (R. 12.) The Appeals Council considered additional evidence that was not available to the ALJ. Among the new evidence was Kandelis's October 2009 letter to the "Court of DuPage" stating that Markello "would not be suited to service work that would involve lifting and active physical activity. She may be able to perform more sedentary work for short durations." (R. 1063.) The Appeals Council denied Plaintiff's request for review because it concluded that the new information did not provide a basis for changing the ALJ's decision. (R. 1-2.) When the SSA Appeals Council denied Plaintiff's request for review, the ALJ's decision became the final decision of the Commissioner. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).

Markello now appeals the Commissioner's decision. She argues that the ALJ (1) "ignored the opinion and most of the treatment records of Dr. Kondelis"; (2) "fail[ed] to properly assess the opinion of . . . Dr. Cruz"; and (3) made a credibility determination regarding Markello that "is not supported by substantial evidence." (Pl.'s Mem. [10] at 11-15.)

## DISCUSSION

**I.     Legal Framework**

A decision by an ALJ becomes the Commissioner's final decision where, as here, the Appeals Council denies a request for review. *See Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* In doing so, the court applies a deferential standard of review, asking whether the ALJ's decision is supported by "substantial evidence." 42 U.S.C. § 405(g); s*ee also Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Substantial evidence is that which a "'reasonable mind might accept as adequate to support a conclusion.'" *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner*, 478 F.3d at 841. "The ALJ need not address every piece of evidence in the record but must 'build an accurate and logical bridge from the evidence to the conclusion.'" *Richards v. Astrue*, 370 F. App'x 727, 730 (7th Cir. 2010) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

**II.    Assessment of Disability Under the Five-Step Analysis**

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security regulations set forth a mandatory five-step sequential analysis, see 20 C.F.R. §§ 404.1520, 416.920, which requires the ALJ to examine:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.

*Kastner v. Astrue*, 697 F3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520).

In order to determine whether a claimant is capable of performing his past work or other work within the national economy (Steps 4 and 5), the ALJ must assess a claimant's residual functional capacity ("RFC"). See 20 C.F.R. §§ 404.1520(e), 404.1560(b)-(c), 416.920(e), 416.960(b)-(c). The individual's RFC is "what [that] individual can still do despite his or her limitations, based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family." *Murphy v. Colvin*, 759 F.3d 811, 817 (7th Cir. 2014) (internal quotation marks and citations omitted). If, at Step 4, the ALJ determines that the claimant can engage in past relevant work, he is not disabled. At Step 5, the ALJ "'assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work.'" *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011) (quoting *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008)). The claimant bears the burden of proof at Steps 1 through 4; the burden then shifts to the Commissioner at Step 5 to "establish that the claimant possesses the residual functional capacity to perform work that exists in a significant quantity in the national economy." *Id.* (footnote omitted) (citing *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005)).

### III. ALJ's Analysis of Plaintiff's Claim

The ALJ found that Markello has not engaged in substantial activity since the alleged onset date of disability, December 24, 2007 (Step 1), and that she suffers from several impairments, including mild cardiomegaly, fibromyalgia, obesity, mood disorder, anxiety disorder, and a history of prescription narcotic dependence (Step 2). (R. 19.) According to the ALJ, however, none of Markello's impairments (or any combination of her impairments) meets the severity of one of the impairments listed by the Commissioner (Step 3). (R. 19.) For instance, the ALJ noted that a state examiner found that Markello was tender at nine of the eighteen points in the fibromyalgia test, but in order to be diagnosed with fibromyalgia, one must experience tenderness in at least eleven points. (R. 21, 21 n.1.)

At Step 4, the ALJ found that Markello has the residual functional capacity to perform light work with the following limitations: she can lift a maximum of twenty pounds occasionally and can lift and carry up to ten pounds frequently; can stand and/or walk approximately six hours of a normal eight-hour workday; must avoid workplace hazards, have only occasional contact with supervisors and coworkers, and no contact with the public; and is restricted to performing only those tasks that require simple, routine, two or three steps. (R. 23.) The ALJ considered Markello's testimony, but found her only partially credible because, the ALJ found, her testimony was exaggerated when compared to the objective evidence and because of her history of drug-seeking behavior. (R. 27.) The ALJ also considered the opinions and notes of Markello's treating physicians, but gave no weight to the assessment of treating physician Cruz, because Cruz rendered his opinion after only three months of treatment. (*Id.*) Furthermore, the ALJ noted, Cruz's treatment notes were inconsistent with the opinion expressed in his report. (R. 27.) The notes noted improvement in Plaintiff's symptoms during her last visit, while the report seemingly ignored that progress. The ALJ did, however, give some weight to the assessment of the state agency physicians and to the function report submitted by Markello's domestic partner. (R. 27.) The physicians' reports were not given controlling weight, "as evidence received at the hearing level indicated the impairments were more severe than either consultant had determined." (*Id.*) Regarding the partner's report, however, the ALJ noted that the report "does not support the claimant's allegation of disability, as some bias favoring the claimant must be assumed." (*Id.*)

Finally, at Step 5, the ALJ found that, although Markello is unable to perform her past work (R. 27), she can still perform jobs that exist in significant numbers in the national economy, given her age, education, work experience, and residual functional capacity. (R. 30.) This conclusion relied heavily on the testimony of the vocational expert, James Breen.

**IV.     Plaintiff's Claims**

As noted, Markello contends that the Commissioner's decision should be reversed on three grounds: She argues that the ALJ (1) "ignored the opinion and most of the treatment records of Dr. Kondelis"; (2) "fail[ed] to properly assess the opinion of . . . Dr. Cruz"; and (3) made a credibility determination regarding Markello that "is not supported by substantial evidence." (Pl.'s Mem. at 11–15.) As explained below, the court finds none of these contentions persuasive.

**A.     *Opinion Treatment Records of Dr. Kondelis***

Markello argues that the court should remand this case to the ALJ so she can consider Kondelis' October 5, 2009 letter, which contains statements regarding Markello's ability to work. This document was not in the record at the time of the ALJ's decision, but the Appeals Council addressed it, concluding that the new evidence did "not provide a basis for changing the [ALJ's] opinion." (R. 2.) Plaintiff's challenge relies on *Farrell v. Astrue*, 692 F.3d 767 (7th 2012), for the proposition that evidence first introduced before the Appeals Council warrants remand where that evidence "fills an 'evidentiary gap.'" If, however, the new evidence is not "new and material," the Appeals Council may properly disregard it. *Id.* at 771. The ALJ in *Farrell* denied the claimant's disability claim based on the fact that, although Farrell had experienced symptoms of fibromyalgia, no doctor had ever formally diagnosed her with fibromyalgia. The Seventh Circuit determined that a subsequently introduced diagnosis of the disease constituted new evidence that filled a material gap in the record, and remanded the case. *Id.*

Kondelis' letter does not similarly solve a missing piece of the puzzle here. In his letter, Kondelis stated that Markello would not be suited for work that requires "lifting and active physical activity." That statement, Markello contends, fills the gap alluded to by the ALJ that "none of the claimant's treating physician[s] opined that claimant was disabled by any of her impairments." (R. 27.) But Markello fails to mention that, in the very same letter, Kondelis observed that Plaintiff "may be able to perform more sedentary work for short durations."

14

(R. 1063.) The ALJ's decision and the testimony of vocational expert Breen are consistent with Kondelis' opinion.[11] Kondelis does not say that Markello is unemployable, and Breen testified that someone who could only sit for forty-five minutes at a time would still be able to perform certain jobs. There is nothing in the Kondelis letter that would materially add to the record. It does not warrant remand.

Markello also argues that the ALJ ignored contrary evidence by making only "limited mention" of Kondelis' treatment notes. (Pl.'s Reply at 2.) While the ALJ may not ignore entire lines of contrary evidence or selectively consider medical reports, *Perkins v. Astrue*, 498 F. App'x 641, 643 (7th Cir. 2013), an ALJ should rely on medical opinions only when they are based on "objective observations" and not merely recitations of a claimant's subjective complaints. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004); *see also Hill v. Astrue*, 295 F. App'x 77, 81 (7th Cir. 2008) (the ALJ may not ignore entire lines of evidence). Furthermore, "an ALJ is not required to discuss every snippet of information from the medical records that might be inconsistent with the rest of the objective medical evidence." *Pepper v. Colvin*, 712 F.3d 351, 363 (7th 2013).

The vast majority of Kondelis' notes consist of recitations of Markello's subjective reports of pain. In one exception, dated October 5, 2009, he notes an MRI performed at Central DuPage Hospital revealed "left tears in the posterior cruciate ligament" and that Markello was "due to see an orthopedic surgeon." (R. 630.) The ALJ did consider Markello's subjective complaints of pain, presented in her own testimony. (R. 24-26.) She was not required to specifically address records documenting those same subjective complaints, and there are no "entire lines of evidence," based on Kondelis' objective findings, that the ALJ ignored.

---

[11] Markello argues that "[i]f Plaintiff could only handle sedentary work for short durations, as Dr. Kondelis stated, she would be off task for at least 20% of a work day, and would be unemployable." (Pl.'s Reply at 2.) This conclusion relies on a logical leap that is unsupported by the record.

15

Markello also argues that the ALJ's references to Kondelis' notes were taken out of context and limited to those statements that tended to detract from Markello's credibility. For instance, the ALJ noted (1) that Kondelis himself declined to characterize Markello as permanently disabled (referring to an application for a handicapped parking placard) (R. 27), and (2) that Kondelis never personally diagnosed Markello with fibromyalgia by conducting tender-point testing. (R. 20.) These citations do not appear to have been selected at random or to the unfair exclusion of contrary evidence in Kondelis' records. Rather, by noting that Kondelis never provided an objective basis in his notes for Markello's fibromyalgia pain, the ALJ offered an explanation for her focus on other aspects of Kondelis' notes. The fact that the material casts a shadow on Markello's credibility does not mean that the ALJ should not have considered it.

### B. Dr. Cruz's Opinion

Plaintiff next argues that the ALJ improperly discounted the opinion of her treating psychiatrist, Dr. Cruz. A treating doctor's opinion is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *see Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010). An ALJ who discounts a treating physician's opinion must give "good reasons" for doing so. 20 C.F.R. § 404.1527(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). In a case where the ALJ discounts the physician's opinion after considering these factors, the court must allow that decision to stand so long as the ALJ "'minimally articulate[d]'" her reasons. *Filus v. Astrue*, 694

F.3d 863, 869 (7th Cir. 2012); *see also Gully v. Colvin*, 593 F. App'x 558, 563-4 (7th Cir. 2014) (quoting *Filus*, 694 F.3d at 869). The ALJ's opinion clears this low hurdle.

The ALJ offered two "good reasons" for giving no weight to Cruz's opinion: (1) the relatively brief period he provided treatment to Markello; and (2) the inconsistencies between his opinion and his treatment notes. A treating physician's opinion is given great deference because she is "more likely to have a detailed and longitudinal view" of the claimant's impairments. *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). But no such deference is warranted "when in fact, there is no detailed or longitudinal view." *Id.* Markello argues that the three months she saw Cruz "is certainly a sufficient period of time in which a treating psychiatrist to formulate a valid opinion about a patient's capacity to work." (Pl.'s Mem. at 13.) She does not, however, point the court to any case in which a court overturned an ALJ's decision where a claimant was treated for a similar or shorter period of time. The ALJ's opinion more than satisfies the deferential standard of review applicable in this context.

This is particularly true in light of the ALJ's additional justification for discounting Cruz's opinion: that opinion was inconsistent with Cruz's treatment notes. (R. 27.) Specifically, the ALJ noted that Markello had reported improvement, but that Cruz had apparently not considered this factor in reaching his opinion. (*Id.*) In considering the weight to give to Cruz's opinion, the ALJ was required to consider that a person who suffers from a mental illness could have good days and bad days such that a "snapshot of any single moment says little about her overall condition." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). Accordingly, the court might be better served by a more detailed explanation for the ALJ's conclusion that Cruz's opinion was in conflict with his own records. The ALJ did, however, allude to Markello's condition over time and did "minimally articulate" her reasoning for discounting Cruz's opinion. As the record indicates, although Markello had reported feeling anxious or having a "meltdown" during her first meetings with Cruz in September 2011, by January 2012 Markello reported her stress had subsided. (R. 1056, 1058.) This trajectory is more than a snapshot view of Plaintiff's condition.

Cruz's records also contain apparent internal inconsistencies. For instance, he rated Markello's "insight" as "full," her judgment as "within normal limits", and her concentration as "fair" (R. 1047-50). Yet, he also noted that Markello's impairments would render her off task more than 15% of the workday (R. 1063), and concluded without comment that Markello could not function in an eight-hour per day, five days per week workplace. (R. 1053.) The record supports the ALJ's decision not to give significant weight to Cruz's opinion.[12]

### C. *ALJ's Credibility Determination*

Finally, Markello argues that the ALJ's determination that her testimony was not credible is unsupported by the record. An ALJ's credibility determination should only be overturned if "patently wrong," meaning that it "lacks any explanation or support." *Elder*, 529 F.3d at 413-14.

Markello argues that the ALJ's alleged failure to properly analyze her physician's opinions and notes necessarily means that "the ALJ's credibility determination is not supported by substantial evidence." (Pl.'s Mem. at 15.) As discussed above, however, the ALJ's treatment of Markello's physician's opinions and notes was not improper. Plaintiff also ignores the ALJ's many stated reasons for discrediting her testimony. For instance, the ALJ noted Markello's drug-seeking tendencies (R. 26), and the fact that her daily activities (e.g., Facebook use, shopping, driving, performing household chores) belie the alleged severity of her impairments. (R. 25-26.) These are appropriate considerations that justify the ALJ's decision to discount Markello's credibility. *See Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010) ("Although an ALJ may not ignore a claimant's subjective reports of pain simply because they

---

[12] Markello also argues that the ALJ completely disregarded Dr. Khan's treatment notes and thus ignored entire lines of contrary evidence in coming to her conclusion. But Khan's treatment notes do not appear to contradict any of the evidence expressly considered by the ALJ. In her decision, the ALJ explicitly considered a multitude of evidence, including the opinions of two different state agency examiners who took Khan's treatment notes into account when coming to their own conclusions about Markello's alleged disability. (R. 27.) The ALJ need not have discussed every single piece of evidence in her decision, and by considering the opinions of doctors who had, in turn, analyzed Khan's treatment notes, the ALJ necessarily considered Khan's notes, as well.

are not supported by the medical evidence, discrepancies between the objective evidence and selfreports may suggest symptom exaggeration."); *Berger v. Astrue*, 516 F.3d 539, 545–46 (7th Cir. 2008) (ALJ appropriately considered ostensible drug-seeking behavior when discrediting claimant). In any event, as the Commissioner points out, the ALJ did give some weight to Markello's testimony: The ALJ's RFC assessment made specific reference to the most important of Plaintiff's claimed limitations, including her fibromyalgia pain and the stress and anxiety she claims to experience around others. (Def.'s Mem. [20] at 7 (citing Tr. 26–27).)

"It is the responsibility of the ALJ, not of a reviewing court, to resolve conflicting evidence and to make credibility determinations." *Elder*, 529 F.3d at 414. The ALJ did just that here and justified her conclusion with ample citations to the record. The court will not substitute its judgment for the ALJ's.

## **CONCLUSION**

For the reasons stated above, Plaintiff's motion for summary judgment [9] is denied, and the Commissioner's motion for summary judgment [19] is granted.

ENTER:

Dated: May 10, 2016  _____
REBECCA R. PALLMEYER
United States District Judge

19